(Slip Opinion)          OCTOBER TERM, 2014                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DIRECT MARKETING ASSOCIATION *v.* BROHL, EXECUTIVE DIRECTOR, COLORADO DEPARTMENT OF REVENUE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 13–1032.   Argued December 8, 2014—Decided March 3, 2015

Colorado requires residents who purchase tangible personal property from a retailer that does not collect sales or use taxes to file a return and remit those taxes directly to the State Department of Revenue.  To improve compliance, Colorado enacted legislation requiring noncollecting retailers to notify any Colorado customer of the State's sales and use tax requirement and to report tax-related information to those customers and the Colorado Department of Revenue.

Petitioner, a trade association of retailers, many of which sell to Colorado residents but do not collect taxes, sued respondent, the Director of the Colorado Department of Revenue, in Federal District Court, alleging that Colorado's law violates the United States and Colorado Constitutions.  The District Court granted petitioner partial summary judgment and permanently enjoined enforcement of the notice and reporting requirements, but the Tenth Circuit reversed.  That court held that the Tax Injunction Act (TIA), which provides that federal district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State," 28 U. S. C. §1341, deprived the District Court of jurisdiction over the suit.

*Held*: Petitioner's suit is not barred by the TIA.  Pp. 4–13.

   (a) The relief sought by petitioner would not "enjoin, suspend or restrain the assessment, levy or collection" of Colorado's sales and use taxes.  Pp. 4–12.

      (1) The terms "assessment," "levy," and "collection" do not en-

compass Colorado's enforcement of its notice and reporting requirements. These terms, read in light of the Federal Tax Code, refer to discrete phases of the taxation process that do not include informational notices or private reports of information relevant to tax liability. Information gathering has long been treated as a phase of tax administration that occurs before assessment, levy, or collection. See, *e.g.,* 26 U. S. C. §6041 *et seq.* Respondent portrays the notice and reporting requirements as part of the State's assessment and collection process, but the State's assessment and collection procedures are triggered after the State has received the returns and made the deficiency determinations that the notice and reporting requirements are meant to facilitate. Enforcement of the requirements may improve the State's ability to assess and ultimately collect its sales and use taxes, but the TIA is not keyed to all such activities. Such a rule would be inconsistent with the statute's text and this Court's rule favoring clear boundaries in the interpretation of jurisdictional statutes. See *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94. Pp. 5–9.

(2) Petitioner's suit cannot be understood to "restrain" the "assessment, levy or collection" of Colorado's sales and use taxes merely because it may inhibit those activities. While the word "restrain" can be defined as broadly as the Tenth Circuit defined it, it also has a narrower meaning used in equity, which captures only those orders that stop acts of assessment, levy, or collection. The context in which the TIA uses the word "restrain" resolves this ambiguity in favor of this narrower meaning. First, the verbs accompanying "restrain"— "enjoin" and "suspend"—are terms of art in equity and refer to different equitable remedies that restrict or stop official action, strongly suggesting that "restrain" does the same. Additionally, "restrain" acts on "assessment," "levy," and "collection," a carefully selected list of technical terms. The Tenth Circuit's broad meaning would defeat the precision of that list and render many of those terms surplusage. Assigning "restrain" its meaning in equity is also consistent with this Court's recognition that the TIA "has its roots in equity practice," *Tully* v. *Griffin, Inc.*, 429 U. S. 68, 73, and with the principle that "[j]urisdictional rules should be clear," *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Mfg.*, 545 U. S. 308, 321 (THOMAS, J., concurring). Pp. 10–12.

(b) The Court takes no position on whether a suit such as this might be barred under the "comity doctrine," which "counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction," *Levin* v. *Commerce Energy, Inc.*, 560 U. S. 413, 421. The Court leaves it to the Tenth Circuit to decide on remand whether the comity argument remains available to Colorado. P. 13.

735 F. 3d 904, reversed and remanded.

Syllabus

THOMAS, J., delivered the opinion for a unanimous Court. KENNEDY, J., filed a concurring opinion. GINSBURG, J., filed a concurring opinion, in which BREYER, J., joined, and in which SOTOMAYOR, J., joined in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1032

_____

## DIRECT MARKETING ASSOCIATION, PETITIONER *v.* BARBARA BROHL, EXECUTIVE DIRECTOR, COLORADO DEPARTMENT OF REVENUE

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[March 3, 2015]

JUSTICE THOMAS delivered the opinion of the Court.

In an effort to improve the collection of sales and use taxes for items purchased online, the State of Colorado passed a law requiring retailers that do not collect Colorado sales or use tax to notify Colorado customers of their use-tax liability and to report tax-related information to customers and the Colorado Department of Revenue. We must decide whether the Tax Injunction Act, which provides that federal district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law," 28 U. S. C. §1341, bars a suit to enjoin the enforcement of this law. We hold that it does not.

## I

### A

Like many States, Colorado has a complementary sales-and-use tax regime. Colorado imposes both a 2.9 percent tax on the sale of tangible personal property within the State, Colo. Rev. Stat. §§39–26–104(1)(a), 39–26–106(1)(a)(II) (2014), and an equivalent use tax for any property stored, used, or consumed in Colorado on which a

sales tax was not paid to a retailer, §§39–26–202(1)(b), 39–26–204(1). Retailers with a physical presence in Colorado must collect the sales or use tax from consumers at the point of sale and remit the proceeds to the Colorado Department of Revenue (Department). §§39–26–105(1), 39–26–106(2)(a). But under our negative Commerce Clause precedents, Colorado may not require retailers who lack a physical presence in the State to collect these taxes on behalf of the Department. See *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 315–318 (1992). Thus, Colorado requires its consumers who purchase tangible personal property from a retailer that does not collect these taxes (a "noncollecting retailer") to fill out a return and remit the taxes to the Department directly. §39–26–204(1).

Voluntary compliance with the latter requirement is relatively low, leading to a significant loss of tax revenue, especially as Internet retailers have increasingly displaced their brick-and-mortar kin. In the decade before this suit was filed in 2010, e-commerce more than tripled. App. 28. With approximately 25 percent of taxes unpaid on Internet sales, Colorado estimated in 2010 that its revenue loss attributable to noncompliance would grow by more than $20 million each year. App. 30–31.

In hopes of stopping this trend, Colorado enacted legislation in 2010 imposing notice and reporting obligations on noncollecting retailers whose gross sales in Colorado exceed $100,000. Three provisions of that Act, along with their implementing regulations, are at issue here.

First, noncollecting retailers must "notify Colorado purchasers that sales or use tax is due on certain purchases . . . and that the state of Colorado requires the purchaser to file a sales or use tax return." §39–21–112(3.5)(c)(I); see also 1 Colo. Code Regs. §201–1:39–21–112.3.5(2) (2014), online at http://www.sos.co.us/CRR (as visited Feb. 27, 2015, and available in the Clerk of Court's case file). The retailer must provide this notice during each transac-

tion with a Colorado purchaser, *ibid.,* and is subject to a penalty of $5 for each transaction in which it fails to do so, Colo. Rev. Stat. §39–21–112(3.5)(c)(II).

Second, by January 31 of each year, each noncollecting retailer must send a report to all Colorado purchasers who bought more than $500 worth of goods from the retailer in the previous year. §39–21–112(3.5)(d)(I); 1 Colo. Code Regs. §§201–1:39–21–112.3.5(3)(a), (c). That report must list the dates, categories, and amounts of those purchases. Colo. Rev. Stat. §39–21–112(3.5)(d)(I); see also 1 Colo. Code Regs. §§201–1:39–21–112.3.5(3)(a), (c). It must also contain a notice stating that Colorado "requires a sales or use tax return to be filed and sales or use tax paid on certain Colorado purchases made by the purchaser from the retailer." Colo. Rev. Stat. §39–21–112(3.5)(d)(I)(A). The retailer is subject to a penalty of $10 for each report it fails to send. §39–21–112(3.5)(d)(III)(A); see also 1 Colo. Code Regs. §201–1:39–21–112.3.5(3)(d).

Finally, by March 1 of each year, noncollecting retailers must send a statement to the Department listing the names of their Colorado customers, their known addresses, and the total amount each Colorado customer paid for Colorado purchases in the prior calendar year. Colo. Rev. Stat. §39–21–112(3.5)(d)(II)(A); 1 Colo. Code Regs. §201–1:39–21–112.3.5(4). A noncollecting retailer that fails to make this report is subject to a penalty of $10 for each customer that it should have listed in the report. Colo. Rev. Stat. §39–21–112(3.5)(d)(III)(B); see also 1 Colo. Code Regs. §201–1:39–21–112.3.5(4)(f).

## B

Petitioner Direct Marketing Association is a trade association of businesses and organizations that market products directly to consumers, including those in Colorado, via catalogs, print advertisements, broadcast media, and the Internet. Many of its members have no physical

presence in Colorado and choose not to collect Colorado sales and use taxes on Colorado purchases. As a result, they are subject to Colorado's notice and reporting requirements.

In 2010, Direct Marketing Association brought suit in the United States District Court for the District of Colorado against the Executive Director of the Department, alleging that the notice and reporting requirements violate provisions of the United States and Colorado Constitutions. As relevant here, Direct Marketing Association alleged that the provisions (1) discriminate against interstate commerce and (2) impose undue burdens on interstate commerce, all in violation of this Court's negative Commerce Clause precedents. At the request of both parties, the District Court stayed all challenges except these two, in order to facilitate expedited consideration. It then granted partial summary judgment to Direct Marketing Association and permanently enjoined enforcement of the notice and reporting requirements. App. to Pet. for Cert. B–1 to B–25.

Exercising appellate jurisdiction under 28 U. S. C. §1292(a)(1), the United States Court of Appeals for the Tenth Circuit reversed. Without reaching the merits, the Court of Appeals held that the District Court lacked jurisdiction over the suit because of the Tax Injunction Act (TIA), 28 U. S. C. §1341. Acknowledging that the suit "differs from the prototypical TIA case," the Court of Appeals nevertheless found it barred by the TIA because, if successful, it "would limit, restrict, or hold back the state's chosen method of enforcing its tax laws and generating revenue." 735 F. 3d 904, 913 (2013).

We granted certiorari, 573 U. S. ___ (2014), and now reverse.

## II

Enacted in 1937, the TIA provides that federal district

courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." §1341. The question before us is whether the relief sought here would "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law." Because we conclude that it would not, we need not consider whether "a plain, speedy and efficient remedy may be had in the courts of" Colorado.

### A

The District Court enjoined state officials from enforcing the notice and reporting requirements. Because an injunction is clearly a form of equitable relief barred by the TIA, the question becomes whether the enforcement of the notice and reporting requirements is an act of "assessment, levy or collection." We need not comprehensively define these terms to conclude that they do not encompass enforcement of the notice and reporting requirements at issue.

In defining the terms of the TIA, we have looked to federal tax law as a guide. See, *e.g., Hibbs* v. *Winn*, 542 U. S. 88, 100 (2004). Although the TIA does not concern federal taxes, it was modeled on the Anti-Injunction Act (AIA), which does. See *Jefferson County* v. *Acker*, 527 U. S. 423, 434–435 (1999). The AIA provides in relevant part that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U. S. C. §7421(a). We assume that words used in both Acts are generally used in the same way, and we discern the meaning of the terms in the AIA by reference to the broader Tax Code. *Hibbs*, *supra,* at 102–105; *id.,* at 115 (KENNEDY, J., dissenting). Read in light of the Federal Tax Code at the time the TIA was enacted (as well as today), these three terms refer to discrete phases of the taxation process that do not include

informational notices or private reports of information relevant to tax liability.

To begin, the Federal Tax Code has long treated information gathering as a phase of tax administration procedure that occurs before assessment, levy, or collection. See §§6001–6117; §§1500–1524 (1934 ed.); see also §1533 ("All provisions of law for the ascertainment of liability to any tax, or the assessment or collection thereof, shall be held to apply . . . "). This step includes private reporting of information used to determine tax liability, see, *e.g.,* §1511(a), including reports by third parties who do not owe the tax, see, *e.g.,* §6041 *et seq.* (2012 ed.); see also §§1512(a)–(b) (1934 ed.) (authorizing a collector or the Commissioner of Internal Revenue, when a taxpayer fails to file a return, to make a return "from his own knowledge and from such information as he can obtain through testimony or otherwise").

"Assessment" is the next step in the process, and it refers to the official recording of a taxpayer's liability, which occurs after information relevant to the calculation of that liability is reported to the taxing authority. See §1530. In *Hibbs*, the Court noted that "assessment," as used in the Internal Revenue Code, "involves a 'recording' of the amount the taxpayer owes the Government." 542 U. S.*,* at 100 (quoting §6203 (2000 ed.)). It might also be understood more broadly to encompass the process by which that amount is calculated. See *United States* v. *Galletti*, 541 U. S. 114, 122 (2004); see also *Hibbs*, *supra,* at 100, n. 3. But even understood more broadly, "assessment" has long been treated in the Tax Code as an official action taken based on information already reported to the taxing authority. For example, not many years before it passed the TIA, Congress passed a law providing that the filing of a return would start the running of the clock for a timely assessment. See, *e.g.,* Revenue Act of 1924, Pub. L. 68–176, §277(a), 43 Stat. 299. Thus, assessment was

understood as a step in the taxation process that occurred after, and was distinct from, the step of reporting information pertaining to tax liability.

"Levy," at least as it is defined in the Federal Tax Code, refers to a specific mode of collection under which the Secretary of the Treasury distrains and seizes a recalcitrant taxpayer's property. See 26 U. S. C. §6331 (2012 ed.); §1582 (1934 ed.). Because the word "levy" does not appear in the AIA, however, one could argue that its meaning in the TIA is not tied to the meaning of the term as used in federal tax law. If that were the case, one might look to contemporaneous dictionaries, which defined "levy" as the legislative function of laying or imposing a tax and the executive functions of assessing, recording, and collecting the amount a taxpayer owes. See Black's Law Dictionary 1093 (3d ed. 1933) (Black's); see also Webster's New International Dictionary 1423 (2d ed. 1939) ("To raise or collect, as by assessment, execution, or other legal process, etc.; to exact or impose by authority . . . "); §§1540, 1544 (using "levying" and "levied" in the more general sense of an executive imposition of a tax liability). But under any of these definitions, "levy" would be limited to an official governmental action imposing, determining the amount of, or securing payment on a tax.

Finally, "collection" is the act of obtaining payment of taxes due. See Black's 349 (defining "collect" as "to obtain payment or liquidation" of a debt or claim). It might be understood narrowly as a step in the taxation process that occurs after a formal assessment. Consistent with this understanding, we have previously described it as part of the "enforcement process . . . that 'assessment' sets in motion." *Hibbs, supra,* at 102, n. 4. The Federal Tax Code at the time the TIA was enacted provided for the Commissioner of Internal Revenue to certify a list of assessments "to the proper collectors . . . who [would] proceed to collect and account for the taxes and penalties so certified."

§1531.  That collection process began with the collector "giv[ing] notice to each person liable to pay any taxes stated [in the list] . . . stating the amount of such taxes and demanding payment thereof." §1545(a).  When a person failed to pay, the Government had various means to collect the amount due, including liens, §1560, distraint, §1580, forfeiture, and other legal proceedings, §1640. Today's Tax Code continues to authorize collection of taxes by these methods.  §6302 (2012 ed.).  "Collection" might also be understood more broadly to encompass the receipt of a tax payment before a formal assessment occurs.  For example, at the time the TIA was enacted, the Tax Code provided for the assessment of money already received by a person "required to *collect* or withhold any internal-revenue tax from any other person," suggesting that at least some act of collection might occur before a formal assessment.  §1551 (1934 ed.) (emphasis added).  Either way, "collection" is a separate step in the taxation process from assessment and the reporting on which assessment is based.

So defined, these terms do not encompass Colorado's enforcement of its notice and reporting requirements.  The Executive Director does not seriously contend that the provisions at issue here involve a "levy"; instead she portrays them as part of the process of assessment and collection.  But the notice and reporting requirements precede the steps of "assessment" and "collection."  The notice given to Colorado consumers, for example, informs them of their use-tax liability and prompts them to keep a record of taxable purchases that they will report to the State at some future point.  The annual summary that the retailers send to consumers provides them with a reminder of that use-tax liability and the information they need to fill out their annual returns.  And the report the retailers file with the Department facilitates audits to determine tax deficiencies.  After each of these notices or reports is filed,

the State still needs to take further action to assess the taxpayer's use-tax liability and to collect payment from him. See Colo. Rev. Stat. §39–26–204(3) (describing the procedure for "assessing and collecting [use] taxes" on the basis of returns filed by consumers and collecting retailers). Colorado law provides for specific assessment and collection procedures that are triggered after the State has received the returns and made the deficiency determinations that the notice and reporting requirements are meant to facilitate. See §39–26–210; 1 Colo. Code Regs. §201–1:39–21–107(1) ("The statute of limitations on assessments of . . . sales [and] use . . . tax . . . shall be three years from the date the return was filed . . . ").

Enforcement of the notice and reporting requirements may improve Colorado's ability to assess and ultimately collect its sales and use taxes from consumers, but the TIA is not keyed to all activities that may improve a State's ability to assess and collect taxes. Such a rule would be inconsistent not only with the text of the statute, but also with our rule favoring clear boundaries in the interpretation of jurisdictional statutes. See *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94 (2010). The TIA is keyed to the acts of assessment, levy, and collection themselves, and enforcement of the notice and reporting requirements is none of these.[1]

_____

[1] Our decision in *California* v. *Grace Brethren Church*, 457 U. S. 393 (1982), is not to the contrary. In that case, California churches and religious schools sought "to enjoin the State from collecting both tax information and the state [unemployment] tax," based, in part, on the argument that "recordkeeping, registration, and reporting requirements" violate the Establishment Clause by creating the potential for excessive entanglement with religion. *Id.,* at 398, 415. We held that the TIA barred that suit. *Id.,* at 396. But nowhere in their brief to this Court did the plaintiffs in *Grace Brethren Church* separate out their request to enjoin the tax from their request for relief from the recordkeeping and reporting requirements. See Brief for Grace Brethren Church et al., in *California* v. *Grace Brethren Church*, O. T. 1981, No.

B

Apparently concluding that enforcement of the notice and reporting requirements was not itself an act of "assessment, levy or collection," the Court of Appeals did not rely on those terms to hold that the TIA barred the suit. Instead, it adopted a broad definition of the word "restrain" in the TIA, which bars not only suits to "enjoin . . . assessment, levy or collection" of a state tax but also suits to "suspend or restrain" those activities. Specifically, the Court of Appeals concluded that the TIA bars any suit that would "limit, restrict, or hold back" the assessment, levy, or collection of state taxes. 735 F. 3d, at 913. Because the notice and reporting requirements are intended to facilitate collection of taxes, the Court of Appeals reasoned that the relief Direct Marketing Association sought and received would "limit, restrict, or hold back" the Department's collection efforts. That was error.

"Restrain," standing alone, can have several meanings. One is the broad meaning given by the Court of Appeals, which captures orders that merely *inhibit* acts of "assessment, levy and collection." See Black's 1548. Another, narrower meaning, however, is "[t]o prohibit from action; to put compulsion upon . . . to enjoin," *ibid.*, which captures only those orders that stop (or perhaps compel) acts of "assessment, levy and collection."

To resolve this ambiguity, we look to the context in which the word is used. *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341 (1997). The statutory context provides several clues that lead us to conclude that the TIA uses the word "restrain" in its narrower sense. Looking to the company "restrain" keeps, *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961), we first note that the words

––––––––––

81–31 etc., pp. 34–38. *Grace Brethren Church* thus cannot fairly be read as resolving, or even considering, the question presented in this case.

"enjoin" and "suspend" are terms of art in equity, see *Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 454 U. S. 100, 126, and n. 13 (1981) (Brennan, J., concurring). They refer to different equitable remedies that restrict or stop official action to varying degrees, strongly suggesting that "restrain" does the same. See *Hibbs*, 524 U. S*.,* at 118 (KENNEDY, J., dissenting); see also *Jefferson County*, 572 U. S., at 433.

Additionally, as used in the TIA, "restrain" acts on a carefully selected list of technical terms—"assessment, levy, collection"—not on an all-encompassing term, like "taxation." To give "restrain" the broad meaning selected by the Court of Appeals would be to defeat the precision of that list, as virtually any court action related to any phase of taxation might be said to "hold back" "collection." Such a broad construction would thus render "assessment [and] levy"—not to mention "enjoin [and] suspend"—mere surplusage, a result we try to avoid. See *Hibbs, supra,* at 101 (interpreting the terms of the TIA to avoid superfluity).

Assigning the word "restrain" its meaning in equity is also consistent with our recognition that the TIA "has its roots in equity practice." *Tully* v. *Griffin, Inc.*, 429 U. S. 68, 73 (1976). Under the comity doctrine that the TIA partially codifies, *Levin* v. *Commerce Energy, Inc.*, 560 U. S. 413, 431–432 (2010), courts of equity exercised their "sound discretion" to withhold certain forms of extraordinary relief, *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293, 297 (1943); see also *Dows* v. *Chicago*, 11 Wall. 108, 110 (1871). Even while refusing to grant certain forms of equitable relief, those courts did not refuse to hear every suit that would have a negative impact on States' revenues. See, *e.g.*, *Henrietta Mills* v. *Rutherford County*, 281 U. S. 121, 127 (1930); see also 5 R. Paul & J. Mertens, Law of Federal Income Taxation §42.139 (1934) (discussing the word "restraining" in the AIA in its equitable sense). The Court of Appeals' definition of "restrain,"

however, leads the TIA to bar every suit with such a nega-
tive impact. This history thus further supports the con-
clusion that Congress used "restrain" in its narrower,
equitable sense, rather than in the broad sense chosen by
the Court of Appeals.

Finally, adopting a narrower definition is consistent
with the rule that "[j]urisdictional rules should be clear."
*Grable & Sons Metal Products, Inc.* v. *Darue Engineering
& Mfg.*, 545 U. S. 308, 321 (2005) (THOMAS, J., concur-
ring); see also *Hertz Corp.*, *supra,* at 94. The question—at
least for negative injunctions—is whether the relief to
some degree stops "assessment, levy or collection," not
whether it merely inhibits them. The Court of Appeals'
definition of "restrain," by contrast, produces a "'vague
and obscure'" boundary that would result in both needless
litigation and uncalled-for dismissal, *Sisson* v. *Ruby*, 497
U. S. 358, 375 (1990) (SCALIA, J., concurring in judgment),
all in the name of a jurisdictional statute meant to protect
state resources.

Applying the correct definition, a suit cannot be under-
stood to "restrain" the "assessment, levy or collection" of a
state tax if it merely inhibits those activities.[2]

_____

[2] Because the text of the TIA resolves this case, we decline the par-
ties' invitation to derive various *per se* rules from our decision in *Hibbs*
v. *Winn*, 542 U. S. 88 (2004). In *Hibbs*, the Court held that the TIA did
not bar an Establishment Clause challenge to a state tax credit for
charitable donations to organizations that provided scholarships for
children to attend parochial schools. *Id.,* at 94–96. Direct Marketing
Association argues that *Hibbs* stands for the proposition that the TIA
has no application to third-party suits by nontaxpayers who do not
challenge their own liability. Brief for Petitioner 18–21. The Executive
Director acknowledges that *Hibbs* created an exception to the TIA, but
argues that the exception does not apply to suits that restrain activities
that have a collection-propelling function. Brief for Respondent 25–33.

In *Levin* v. *Commerce Energy, Inc.*, 560 U. S. 413 (2010), we empha-
sized the narrow reach of *Hibbs*, explaining that it was not "a run-of-
the-mine tax case," 560 U. S., at 430. As we explained, *Hibbs* held only
"that the TIA did not preclude a federal challenge by a third party who

## III

We take no position on whether a suit such as this one might nevertheless be barred under the "comity doctrine," which "counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction." *Levin*, *supra,* at 421. Under this doctrine, federal courts refrain from "interfer[ing] . . . with the fiscal operations of the state governments . . . in all cases where the Federal rights of the persons could otherwise be preserved unimpaired." *Id.,* at 422 (internal quotation marks omitted).

Unlike the TIA, the comity doctrine is nonjurisdictional. And here, Colorado did not seek comity from either of the courts below. Moreover, we do not understand the Court of Appeals' footnote concerning comity to be a holding that comity compels dismissal. See 735 F. 3d, at 920, n. 11 ("Although we remand to dismiss [petitioner's] claims pursuant to the TIA, we note that the doctrine of comity also militates in favor of dismissal"). Accordingly, we leave it to the Tenth Circuit to decide on remand whether the comity argument remains available to Colorado.

\*    \*    \*

Because the TIA does not bar petitioner's suit, we reverse the judgment of the Court of Appeals. Like the Court of Appeals, we express no view on the merits of those claims and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

———————

objected to a tax credit received by others, but in no way objected to her own liability under any revenue-raising tax provision." 560 U. S., at 430; accord, *id.,* at 434 (THOMAS, J., concurring in judgment). Because we have already concluded that the TIA does not preclude this challenge, it is unnecessary to consider whether and how the narrow rule announced in *Hibbs* would apply to suits like this one.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1032

_____

## DIRECT MARKETING ASSOCIATION, PETITIONER *v.* BARBARA BROHL, EXECUTIVE DIRECTOR, COLORADO DEPARTMENT OF REVENUE

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[March 3, 2015]

JUSTICE KENNEDY, concurring.

The opinion of the Court has my unqualified join and assent, for in my view it is complete and correct. It does seem appropriate, and indeed necessary, to add this separate statement concerning what may well be a serious, continuing injustice faced by Colorado and many other States.

Almost half a century ago, this Court determined that, under its Commerce Clause jurisprudence, States cannot require a business to collect use taxes—which are the equivalent of sales taxes for out-of-state purchases—if the business does not have a physical presence in the State. *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753 (1967). Use taxes are still due, but under *Bellas Hess* they must be collected from and paid by the customer, not the out-of-state seller. *Id.,* at 758.

Twenty-five years later, the Court relied on *stare decisis* to reaffirm the physical presence requirement and to reject attempts to require a mail-order business to collect and pay use taxes. *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 311 (1992). This was despite the fact that under the more recent and refined test elaborated in *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977), "contemporary Commerce Clause jurisprudence might not dictate the

same result" as the Court had reached in *Bellas Hess*. *Quill Corp.*, 504 U. S., at 311. In other words, the *Quill* majority acknowledged the prospect that its conclusion was wrong when the case was decided. Still, the Court determined vendors who had no physical presence in a State did not have the "substantial nexus with the taxing state" necessary to impose tax-collection duties under the Commerce Clause. *Id.*, at 311–313. Three Justices concurred in the judgment, stating their votes to uphold the rule of *Bellas Hess* were based on *stare decisis* alone. *Id.,* at 319 (SCALIA, J., joined by KENNEDY, J., and THOMAS, J., concurring in part and concurring in judgment). This further underscores the tenuous nature of that holding—a holding now inflicting extreme harm and unfairness on the States.

In *Quill*, the Court should have taken the opportunity to reevaluate *Bellas Hess* not only in light of *Complete Auto* but also in view of the dramatic technological and social changes that had taken place in our increasingly interconnected economy. There is a powerful case to be made that a retailer doing extensive business within a State has a sufficiently "substantial nexus" to justify imposing some minor tax-collection duty, even if that business is done through mail or the Internet. After all, "interstate commerce may be required to pay its fair share of state taxes." *D. H. Holmes Co.* v. *McNamara*, 486 U. S. 24, 31 (1988). This argument has grown stronger, and the cause more urgent, with time. When the Court decided *Quill*, mail-order sales in the United States totaled $180 billion. 504 U. S., at 329 (White, J., concurring in part and dissenting in part). But in 1992, the Internet was in its infancy. By 2008, e-commerce sales alone totaled $3.16 trillion per year in the United States. App. 28.

Because of *Quill* and *Bellas Hess*, States have been unable to collect many of the taxes due on these purchases. California, for example, has estimated that it is able to

collect only about 4% of the use taxes due on sales from out-of-state vendors. See California State Board of Equal-ization, Revenue Estimate: Electronic Commerce and Mail Order Sales, Rev. 8/13, p. 7 (2013) (Table 3). The result has been a startling revenue shortfall in many States, with concomitant unfairness to local retailers and their customers who do pay taxes at the register. The facts of this case exemplify that trend: Colorado's losses in 2012 are estimated to be around $170 million. See D. Bruce, W. Fox, & L. Luna, State and Local Government Sales Tax Revenue Losses from Electronic Commerce 11 (2009) (Table 5). States' education systems, healthcare services, and infrastructure are weakened as a result.

The Internet has caused far-reaching systemic and structural changes in the economy, and, indeed, in many other societal dimensions. Although online businesses may not have a physical presence in some States, the Web has, in many ways, brought the average American closer to most major retailers. A connection to a shopper's favor-ite store is a click away—regardless of how close or far the nearest storefront. See PricewaterhouseCoopers, Under-standing How U. S. Online Shoppers Are Reshaping the Retail Experience 3 (Mar. 2012) (nearly 70% of American consumers shopped online in 2011). Today buyers have almost instant access to most retailers via cell phones, tablets, and laptops. As a result, a business may be pre-sent in a State in a meaningful way without that presence being physical in the traditional sense of the term.

Given these changes in technology and consumer so-phistication, it is unwise to delay any longer a reconsider-ation of the Court's holding in *Quill*. A case questionable even when decided, *Quill* now harms States to a degree far greater than could have been anticipated earlier. See *Pearson* v. *Callahan*, 555 U. S. 223, 233 (2009) (*stare decisis* weakened where "experience has pointed up the precedent's shortcomings"). It should be left in place only

if a powerful showing can be made that its rationale is still correct.

The instant case does not raise this issue in a manner appropriate for the Court to address it. It does provide, however, the means to note the importance of reconsidering doubtful authority. The legal system should find an appropriate case for this Court to reexamine *Quill* and *Bellas Hess.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1032

_____

## DIRECT MARKETING ASSOCIATION, PETITIONER *v.* BARBARA BROHL, EXECUTIVE DIRECTOR, COLORADO DEPARTMENT OF REVENUE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[March 3, 2015]

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring.*

I write separately to make two observations.

*First*, as the Court has observed, Congress designed the Tax Injunction Act not "to prevent federal-court interference with all aspects of state tax administration," *Hibbs* v. *Winn*, 542 U. S. 88, 105 (2004) (internal quotation marks omitted), but more modestly to stop litigants from using federal courts to circumvent States' "pay without delay, then sue for a refund" regimes. See *id.,* at 104–105 ("[I]n enacting the [Tax Injunction Act], Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority."). This suit does not implicate that congressional objective. The Direct Marketing Association is not challenging its own or anyone else's tax liability or tax collection responsibilities. And the claim is not one likely to be pursued in a state refund action. A different question would be posed, however, by a suit to enjoin reporting obligations imposed on a taxpayer or tax collector, *e.g.,* an employer or an in-state retailer,

_____

*JUSTICE SOTOMAYOR joins this opinion with respect to the first observation.

litigation in lieu of a direct challenge to an "assessment," "levy," or "collection." The Court does not reach today the question whether the claims in such a suit, *i.e.,* claims suitable for a refund action, are barred by the Tax Injunction Act. On that understanding, I join the Court's opinion.

*Second*, the Court's decision in this case, I emphasize, is entirely consistent with our decision in *Hibbs.* The plaintiffs in *Hibbs* sought to enjoin certain state tax credits. That suit, like the action here, did not directly challenge "acts of assessment, levy, and collection themselves," *ante*, at 9. See *Hibbs*, 542 U. S., at 96, 99–102. Moreover, far from threatening to deplete the State's coffers, "the relief requested [in *Hibbs*] would [have] result[ed] in the state's receiving *more* funds that could be used for the public benefit." *Id.,* at 96 (internal quotation marks omitted; emphasis added). Even a suit that somewhat "inhibits" "assessment, levy, or collection," the Court holds today, falls outside the scope of the Tax Injunction Act. *Ante,* at 12. That holding casts no shadow on *Hibbs*' conclusion that a suit further removed from the Act's "state-revenue-protective moorings," 542 U. S., at 106, remains outside the Act's scope.