GORSUCH, Circuit Judge,
concurring.
I agree with everything the court has said and write only to acknowledge a few additional points that have influenced my thinking in this case.
In our legal order past decisions often control the outcome of present disputes. Some criticize this feature of our law, suggesting that respect for judicial precedent invests dead judges with too much authority over living citizens. They contend, too, that it invites current judges to avoid thinking for themselves and to succumb instead in “judicial somnambulism.” Jerome Frank, Law and the Modern Mind 171 (1930). But in our legal order judges distinguish themselves from politicians by the oath they take to apply the law as it is, not to reshape the law as they wish it to be. And in taking the judicial oath judges do not necessarily profess a conviction that *1148 every precedent is rightly decided, but they must and do profess a conviction that a justice system that failed to attach power to precedent, one that surrendered similarly situated persons to wildly different fates at the hands of unconstrained judges, would hardly be worthy of the name.
At the center of this appeal is a claim about the power of precedent. In fact, the whole field in which we are asked to operate today — dormant commerce clause doctrine — might be said to be an artifact of judicial precedent. After all, the Commerce Clause is found in Article I of the Constitution and it grants Congress the authority to adopt laws regulating interstate commerce. Meanwhile, in dormant commerce clause cases Article III courts have claimed the (anything but dormant) power to strike down some state laws even in the absence of congressional direction. See, e.g., Comptroller of Treasury of Md. v. Wynne, — U.S. —, 135 S.Ct. 1787, 1808, 191 L.Ed.2d 813 (2015) (Scalia, J., dissenting); Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 614-17, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (Thomas, J., dissenting). And the plaintiffs’ attempt in this case to topple Colorado’s statutory scheme depends almost entirely on a claim about the power of a single dormant commerce clause decision: Quill Corp. v. North Dakota, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992).
Everyone before us acknowledges that Quill is among the most contentious of all dormant commerce clause cases. Everyone before us acknowledges that it’s been the target of criticism over many years from many quarters, including from many members of the Supreme Court. See Maj. Op. at 1137 n. 14 (citing scholarly literature); Quill, 504 U.S. at 319-20, 112 S.Ct. 1904 (Scalia, J., concurring in part and concurring in the judgment); id. at 321-33, 112 S.Ct. 1904 (White, J., concurring in part and dissenting in part); Direct Mktg. Ass’n v. Brohl, — U.S. —, 135 S.Ct. 1124, 1134-35, 191 L.Ed.2d 97 (2015) (Kennedy, J., concurring). But, the plaintiffs remind us, Quill remains on the books' and we are duty-bound to follow it. And about that much the plaintiffs are surely right: we are obliged to follow Quill out of fidelity to our system of precedent whether or not we profess confidence in the decision itself. For while a court may in rare circumstances overrule a decision of its own devise, this court may of course never' usurp the power to overrule a decision of the Supreme Court.
With that much plain enough, the question remains what exactly Quill requires of us. Later (reading) courts faced with guidance from earlier (writing) courts sometimes face questions how best to interpret that guidance. And the parties before us today offer wildly different accounts of Quill. Most narrowly, everyone agrees that Quill’s holding forbids states from imposing sales and use tax collection duties on firms that lack a physical presence in-state. And everyone agrees that Colorado’s law doesn’t quite go that far. While Colorado requires in-state brick- and-mortar firms to collect sales and use taxes, it asks out-of-state mail order and internet firms only to supply reports designed to enable the state itself to collect the taxes in question. Indeed, Colorado suggests that its statutory scheme carefully and consciously stops (just) short of doing what Quill’s holding forbids.
But as the plaintiffs note, that is hardly the end of it. Our obligation to precedent obliges us to abide not only a prior case’s holding but also to afford careful consideration to the reasoning (the “ratio deciden-di”) on which it rests. And surely our respect for a prior decision’s reasoning must be at its zenith when the decision emanates from the Supreme Court. In *1149 deed, our court has said that it will usually defer even to the dicta (not just the ratio) found in Supreme Court decisions. See, e.g., Tokoph v. United States, 774 F.3d 1300, 1303-04 (10th Cir.2014). And building on this insight the plaintiffs argue that respect for Quill’s ratio, if not its holding, requires us to strike down Colorado’s law. After all, the plaintiffs note, Colorado’s regulatory scheme seeks to facilitate the collection of sales and use taxes by requiring out-of-state firms to satisfy various notice and reporting obligations — burdens comparable in their severity to those associated with collecting the underlying taxes themselves.
It’s a reasonable argument, but like my colleagues I believe there’s a reason it’s wrong. The reason lies in the exceptional narrowness of Quill’s ratio. If the Court in Quill had suggested that state laws commanding out-of-state firms to collect sales and use taxes violated dormant commerce clause doctrine because they are too burdensome, then I would agree that we would be obliged to ask whether Colorado’s law imposes a comparable burden. But Quill’s ratio doesn’t sound in the comparability of burdens — it is instead and itself all about the respect due precedent, about the doctrine of stare decisis and the respect due a still earlier decision. See Quill, 504 U.S. at 317, 112 S.Ct. 1904; id. at 320, 112 S.Ct. 1904 (Scalia, J., concurring in part and concurring in the judgment); Brohl, 135 S.Ct. at 1134 (Kennedy, J., concurring).
This distinction proves decisive. Some years before Quill, in National Bellas Hess, Inc. v. Department of Revenue of Illinois, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), the Supreme Court held that states could not impose use tax collection duties on out-of-state firms. In Quill, the Court openly reconsidered that decision and ultimately chose to retain its rule — but did so only to protect the reliance interests that had grown up around it. Indeed, the Court expressly acknowledged that Bellas Hess very well might have been decided differently under “contemporary Commerce Clause jurisprudence” and cases like Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076 (1977). Quill, 504 U.S. at 311, 112 S.Ct. 1904; cf. Billy Hamilton, Remembrance of Things Not So Past: The Story Behind the Quill Decision, 59 St. Tax Notes Mag. 807 (2011). The Court also expressly acknowledged that states can constitutionally impose tax and regulatory burdens on out-of-state firms that are more or less comparable to sales and use tax collection duties. See Quill, 504 U.S. at 311-12, 314-15, 112 S.Ct. 1904. And the Court expressly acknowledged that this dichotomy — between (impermissible) sales and use tax collection obligations and (permissible) comparable tax and regulatory burdens — is pretty “artificial” and “formalistic.” Id. Given all this, respect for Quill’s reasoning surely means we must respect the Bellas Hess rule it retained. But just as surely it means we are under no obligation to extend that rule to comparable tax and regulatory obligations.
In fact, this much is itself a matter of precedent for this court and many others have already held Quill does nothing to forbid states from imposing regulatory and tax duties of comparable severity to sales and use tax collection duties. See, e.g., Am. Target Advert., Inc. v. Giani, 199 F.3d 1241, 1255 (10th Cir.2000), cert. denied, 531 U.S. 811, 121 S.Ct. 34, 148 L.Ed.2d 14 (2000); KFC Corp. v. Iowa Dep’t of Revenue, 792 N.W.2d 308, 324-28 (Iowa 2010), cert. denied, — U.S. —, 132 S.Ct. 97, 181 L.Ed.2d 26 (2011) (mem.); Capital One Bank v. Comm’r of Revenue, 453 Mass. 1, 899 N.E.2d 76, 84-86 (2009), cert. denied, 557 U.S. 919, 129 S.Ct. 2827, 174 L.Ed.2d 553 (2009); Tax Comm’r v. MBNA Am. Bank, N.A., 220 W.Va. 163, *1150 640 S.E.2d 226, 232-34 (2006), cert. denied sub nom FIA Card Servs., N.A. v. Tax Comm’r, 551 U.S. 1141, 127 S.Ct. 2997, 168 L.Ed.2d 719 (2007).
It may be rare for Supreme Court precedents to suffer as highly a “distinguished” fate as Bellas Hess — but it isn’t unprecedented. Take baseball. Years ago and speaking through Justice Holmes, the Supreme Court held baseball effectively immune from the federal antitrust laws and did so reasoning that the “exhibition[ ] of base ball” by professional teams crossing state lines didn’t involve “commerce among the States.” Federal Baseball Club of Balt., Inc. v. Nat’l League of Prof'l Baseball Clubs, 259 U.S. 200, 208-09, 42 S.Ct. 465, 66 L.Ed. 898 (1922). Since then the Supreme Court has recognized that other organizations offering “exhibitions” in various states do engage in interstate commerce and are subject to antitrust scrutiny. E.g., United States v. Shubert, 348 U.S. 222, 230-31, 75 S.Ct. 277, 99 L.Ed. 279 (1955). But though it has long since rejected the reasoning of Federal Baseball, the Supreme Court has still chor sen to retain the holding itself — continuing to rule baseball effectively immune from the antitrust laws, if now only out of respect for the reliance interests the Federal Baseball decision engendered in that particular industry. Toolson v. N.Y. Yankees, Inc., 346 U.S. 356, 357, 74 S.Ct. 78, 98 L.Ed. 64 (1953) (per curiam). And, of course, Congress has since codified baseball’s special exemption. See 15 U.S.C. § 26b. So it is that the baseball rule now applies only to baseball itself, having lost every away game it has played.
Accepting at this point that Quill doesn’t require us to declare Colorado’s law unconstitutional, the question remains whether some other principle in dormant commerce clause doctrine might. For their part the plaintiffs identify (only) one other potential candidate, suggesting that Colorado’s law runs afoul of the principle that states may not discriminate against out-of-state firms, a principle often associated with West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). And to the extent that there’s anything that’s uncontroversial about dormant commerce clause jurisprudence it may be this anti-discrimination principle, for even critics of dormant commerce clause doctrine often endorse it even as they suggest it might find a more textually comfortable home in other constitutional provisions. E.g., Camps Newfound, 520 U.S. at 610, 117 S.Ct. 1590 (Thomas, J., dissenting).
But any claim of discrimination in this case is easily rejected. The plaintiffs haven’t come close to showing that the notice and reporting burdens Colorado places on out-of-state mail order and internet retailers compare unfavorably to the administrative burdens the state imposes on instate brick-and-mortar retailers who must collect sales and use taxes. If anything, by asking us to strike down Colorado’s law, out-of-state mail order and internet retailers don’t seek comparable treatment to their in-state brick-and-mortar rivals, they seek more favorable treatment, a competitive advantage, a sort of judicially sponsored arbitrage opportunity or “tax shelter.” Quill, 504 U.S. at 329, 112 S.Ct. 1904 (White, J., concurring in part and dissenting in part).
Of course, the mail order and internet retailer plaintiffs might respond that, whatever its propriety, they are entitled to a competitive advantage over their brick- and-mortar competitors thanks to Bellas Hess and Quill. And about that much (again) I cannot disagree. It is a fact — if an analytical oddity — that the Bellas Hess branch of dormant commerce clause jurisprudence guarantees a competitive benefit to certain firms simply because of the or *1151 ganizational form they choose to assume while the mainstream of dormant commerce clause jurisprudence associated with West Lynn Creamery is all about preventing discrimination between firms.[1] And the plaintiffs might well complain that the competitive advantage they enjoy will be diluted by our decision in this.case. Indeed, if my colleagues and I are correct that states may impose notice and reporting burdens on mail order and internet retailers comparable to the sales and use tax collection obligations they impose on brick-and-mortar firms, many (all?)' states can be expected to follow Colorado’s lead and enact statutes like the one now before us.
But this result too seems to me, as it does to my colleagues, entirely consistent with the demands of precedent. After all, by reinforcing an admittedly “formalistic” and “artificial” distinction between sales and use tax collection obligations and other comparable regulatory and tax duties, Quill invited states to impose comparable duties. In this way, Quill might be said to have attached a sort of expiration date for mail order and internet vendors’ reliance interests on Bellas Hess’s rule by perpetuating its rule for the time being while also encouraging states over time to find ways of achieving comparable results through different means. In this way too Quill is perhaps unusual but hardly unprecedented, for while some precedential islands manage to survive indefinitely even when surrounded by a sea of contrary law (e.g., Federal Baseball), a good many others disappear when reliance interests never form around them or erode over time (e.g., Montejo v. Louisiana, 556 U.S. 778, 792-93, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009)). And Quill’s very reasoning — its ratio de-cidendi — seems deliberately designed to ensure that Bellas Hess’s precedential island would never expand but would, if anything, wash away with the tides of time.
I respectfully concur.

. An oddity that, if anything, seems to grow by the day, for if it were ever thought that mail-order retailers were small businesses meriting (constitutionalized, no less) protection from behemoth brick-and-mortar enterprises, that thought must have evaporated long ago. Anecdotal evidence to be sure but consider: today's e-commerce retail leader, Amazon, recorded nearly ninety billion dollars in sales in 2014 while the vast majority of small businesses recorded no online sales at all. See Amazon.com, Inc., Annual Report on SEC Form 10-K at 17 (2014); Ryan Lunka, Retail Data: 100 Stats About Retail, eCommerce & Digital Marketing (July 9, 2015), https://www.nchannel.com/blog/retail-data-ecommerce-statistics/.